NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
ERIC J. BUESCHER (SBN 271323)
ebuescher@cpmlegal.com
**COTCHETT PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-3606

JACK W. LEE (SBN 71626)
jlee@minamitamaki.com
DEREK G. HOWARD (SBN 118082)
dhoward@minamitamaki.com
**MINAMI TAMAKI, LLP**
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel.: (415) 788-9000
Fax: (415) 398-3887

*Attorneys for Plaintiff* George Straghalis

FILED

2011 JUN -7 PM 3:29

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY ______

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**GEORGE STRAGHALIS**, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**FMR LLC, FIDELITY BROKERAGE SERVICES LLC,**

Defendants.

Case No. CV 11-00071 DSF (RZx)

**PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

**(1) FRAUD**

**(2) VIOLATION OF BUS. & PROF. CODE §§ 17200 *et seq.***

**JURY TRIAL DEMANDED**

Judge: Hon. Dale S. Fischer

BY FAX

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. PARTIES ........ 3

III. JURISDICTION AND VENUE ........ 4

IV. CLASS ACTION ALLEGATIONS ........ 4

V. STATEMENT OF FACTS ........ 6

A. Overview of the Brokered Certificates of Deposit Market ........ 6

B. Defendants Misled Consumers to Lure Them to Purchase CDs from Fidelity Instead of Going to the Issuing Bank ........ 7

C. Plaintiff's Purchases of CDs Show a Pattern and Practice of Fidelity Charging Fees on Fee Free Products ........ 8

D. Plaintiff's Discovery of the Fees and Fidelity's Explanation of its Conduct ........ 11

VI. CAUSES OF ACTION ........ 14

FIRST CAUSE OF ACTION (COMMON LAW FRAUD – AGAINST ALL DEFENDANTS) ........ 14

SECOND CAUSE OF ACTION (VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *et seq.* AGAINST ALL DEFENDANTS) ........ 15

VII. PRAYER FOR RELIEF ........ 17

JURY TRIAL DEMAND ........ 18

## I. INTRODUCTION

1. Plaintiff GEORGE STRAGHALIS ("Plaintiff" or "Straghalis") brings this action on behalf of himself and all others similarly situated who purchased FDIC-insured bank-issued certificates of deposits ("CDs"), from April 18, 2006 until February 25, 2009, on the advertised promise on the Fidelity website – www.Fidelity.com – that their purchased CD transactions would be "fee-free." Plaintiff purchased numerous brokered CDs online through Fidelity between May 5, 2006 and September 17, 2008.

2. Defendants FMR LLC and FIDELITY BROKERAGE SERVICES LLC (collectively "Defendants" or "Fidelity") sell "brokered CDs." A brokered CD is issued by a banking institution, through a deposit broker (i.e. Fidelity) to a consumer. The consumer's money goes to the issuing institution and is FDIC insured through the issuing institution up to the FDIC limit. By purchasing brokered CDs, a consumer can take advantage of the FDIC protections at more than one banking institution without having to set up an account at each individual institution.

3. During the relevant time period identified above, Fidelity's website proclaimed that "all new issue CDs are fee-free." However, Fidelity was charging significant fees to consumers by reducing the rate of return the issuing bank was offering when Fidelity brokered the CDs. **After the class period ended, Fidelity's website added disclosures to the "fee-free" language stating that Fidelity was receiving a "concession" fee which was between one and two percent of the investment amount.**

4. Straghalis, as a reasonable consumer, understood the "fee-free" promise to mean that he was getting the same benefit as if he had bought from the issuing bank—that is, Fidelity **was not earning money at the consumers' expense** through transaction fees or reductions in interest rates and was offering the same return on the brokered CDs as the issuing institution. This interpretation of "all new issue CDs offered by Fidelity are fee-free" is imminently reasonable.

5. Fidelity, however, meant something entirely different than this reasonable and straight-forward interpretation of "fee-free." Fidelity interpreted "fee-free" to mean sometime akin to "we will earn money at your expense by reducing the interest you will receive if you purchase a brokered CD through our platform instead of through the issuing bank." This is an unreasonable, unfair, deceitful and fraudulent interpretation of a plain statement, and is one which misled the Plaintiff and other consumers.

6. Plaintiff does not and did not begrudge that Fidelity has a right to earn a profit on any transactions, but does contend that Fidelity has to be truthful about how profit will be earned.

7. During the class period, Fidelity disclosed that it received fixed amount payments, on "placement fees" from the issuing banks for each transaction. Unfortunately, Fidelity chose to take an additional undisclosed fee from consumers.

8. Plaintiff generally understood that when he placed orders for a CD, Fidelity would have the use of his money while the transaction settled, often for as long as five days and this was how Fidelity was earning money on this float. Applied to all of the CD purchases by consumers, this would amount to a substantial benefit for Fidelity with zero risk for Fidelity.

9. The brokered CDs were advertised as, and promised to be, "fee-free" but as it turns out were plainly not. The reduction in interest paid to consumers, made unilaterally by Fidelity and without disclosure constituted a fee and deprived consumers and Plaintiff of money to which they rightfully were entitled.

10. If a ticket broker sold "fee-free" tickets to a concert or sporting event, a consumer would reasonably interpret that to mean that the tickets would be the same price **to the consumer** through the broker as they would be through the box-office. If the ticket broker was marking up the price on those tickets, the promise that the transaction would be "fee-free" would be false, misleading and deceitful. Fidelity has engaged in identical conduct. Fidelity was selling a CD which was issued by,

another bank. The money used to purchase the CD went to the other bank, and the investment by the consumer was FDIC insured through the other bank. Fidelity promised that these brokered CDs would be "fee-free." Fidelity then charged a fee by forcing consumers to receive a lower return than they were entitled to.

11. Fidelity failed to disclose to consumers that it was earning a profit at their expense by reducing the rate of return on the product they were being offered. This plainly constitutes a "fee."

## II. PARTIES

12. Plaintiff **GEORGE STRAGHALIS** is a resident of Arcadia, California, in the County of Los Angeles. He purchased brokered CDs from Defendants in the State of California.

13. Defendant **FMR LLC** is a privately held corporation organized and existing under the laws of the state of Delaware, with its principal place of business in the state of Massachusetts. FMR LLC operates one of the world's largest online brokerages and maintains investor centers throughout North America, Europe and Asia through its non-integrated subsidiary Fidelity Brokerage Services.

14. Defendant **FIDELITY BROKERAGE SERVICES LLC** is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Boston, Massachusetts. Fidelity Brokerage Services LLC is a non-integrated subsidiary of FMR LLC.

15. The Defendants, and each of them, are individually sued as participants, co-conspirators, joint venturers, and aiders and abettors in the improper acts, plans, scheme, and transactions that are the subject of this complaint.

16. Whenever this complaint refers to any act or acts of Fidelity, the reference shall also be deemed to mean that the directors, officers, employees, affiliates of Fidelity, authorized such act while actively engaged in the management and direction of Fidelity.

## III. JURISDICTION AND VENUE

17. This Court has diversity subject matter jurisdiction over this class pursuant to the Class Action Fairness Act of 2005 ("CAFA"), which amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds $5,000,000 exclusive of interest and costs.

18. Venue is proper in this district. This Court has personal jurisdiction over the parties because Plaintiff resides in the District, the Defendant maintains offices in this District and a substantial part of the events, acts and omissions and transactions complained of herein occurred in this District. At all relevant times herein, defendant conducted substantial business and/or committed violations of law by acts committed in this District.

19. Defendants have sufficient minimum contacts with California to make the exercise of jurisdiction over Defendants consistent with traditional notions of fair play and substantial justice.

20. Defendants participate, and during the relevant period did participate, in the California market through the sale of brokered CDs (and other products).

## IV. CLASS ACTION ALLEGATIONS

21. This action is brought and may properly be maintained as a class action pursuant to provisions of Fed. R. Civ. P. 23 and the California Code of Civil Procedure § 382. Plaintiff brings this action on behalf of himself and all others similarly situated as representative members of the following proposed class of:

> All persons and entities who purchased new issue brokered CDs from Fidelity through its website www.Fidelity.com that were advertised as "fee-free" during the time period April 18, 2006 to February 25, 2009 and who suffered harm (the "Class").

22. In this suit, Plaintiff seeks, for himself and members of the Class, legal and equitable relief, including declaratory, restitutionary and other equitable monetary relief, and economic and statutory damages as set forth in this Complaint. This includes, but is not limited to, disgorgement of illegally retained money as a result of Fidelity's wrongdoing, and damages absorbed by the Class.

23. The proposed Class is ascertainable and so numerous that the individual joinder of all its members in one action is impracticable. While the exact number and the identities of Class members are unknown at this time and can only be ascertained through appropriate investigation and discovery, inasmuch as Defendants conduct business throughout the state of California, Plaintiff estimates the Class to include thousands of past and present Fidelity customers. Each transaction is well documented and recorded by Fidelity and the number and identity of Class members can be obtained from Fidelity's business records.

24. Common questions of law and fact arising out of the claims here at issue exist as to all members of the Class and predominate over any individual issues. Proof of a common state of facts will establish the right of each member of the Class to recover. Among the questions of law and fact common to the Class are:

a. Whether Fidelity engaged in a common course of deceptive conduct, including the deceptive acts and practices identified herein;
b. Whether Fidelity made misrepresentations and omissions regarding the sales of brokered CDs, specifically by identifying them as "fee-free";
c. Whether Fidelity knowingly, intentionally or recklessly engaged in a deceptive course of conduct in order to induce prospective customers to purchase their brokered CDs;
d. Whether Defendants improperly took money belonging to Plaintiff and the Class;
e. Whether Fidelity continued to collect or retain the monies here at issue despite their knowledge of or reckless disregard for the true facts;

f. Whether Fidelity's promotional materials constituted false or deceptive advertising;

g. Whether the Class has been harmed and the proper measure of compensatory damages; and

h. Whether due to Fidelity's wrongful actions punitive damages should be awarded to Plaintiff and Class members.

25. Plaintiff's claims are typical of those of the Class, and Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class action litigation.

26. Plaintiff and Class members have suffered harm and damages as a result of Fidelity's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most members of the class would likely find the cost of adjudicating their claims to be prohibitive, and would have no effective remedy at law. The names and addresses of the Class members are available from the business records of Defendants. Notice can be provided to the Class members by first class mail and by using other techniques customarily used in class actions.

## V. STATEMENT OF FACTS

### A. Overview of the Brokered Certificates of Deposit Market

27. As defined herein, a certificate of deposit ("CD") is an FDIC-insured financial product. CDs are a conservative investment product. An FDIC insured CD requires a purchaser to deposit money into a bank for a specific amount of time. CDs are similar to savings accounts in that they are not regulated by the SEC, are completely FDIC insured and are nearly risk-free.

28. Fidelity's website contained the statement that "All new issue CDs offered by Fidelity are FDIC-insured."

29. Currently, the standard insurance coverage amount is $250,000.00 per owner or depositor for single accounts. This amount is per bank, meaning than a

single person could have more than $250,000.00 in total assets insured by the FDIC if those assets were held at different banks.[1]

30. In exchange for keeping the specified amount of money on deposit for an agreed upon term, institutions grant higher interest rates than they do on other accounts from which money may be withdrawn at any time.

31. There are several different types of CDs available to consumers. One of these types is the "brokered CD."

32. Brokerage firms, such as Fidelity, are known as "deposit brokers." Brokerage CDs are issued by banks for the customers of brokerage firms, with the deposits received being obligations of the issuing bank.

33. The money from the purchaser is directed to the issuing bank. The CD is insured by the FDIC through the issuing bank.

**B. <u>Defendants Misled Consumers to Lure Them to Purchase CDs from Fidelity Instead of Going to the Issuing Bank</u>**

34. California investors spend huge sums of money each year on brokered CDs, making competition for investment dollars very stiff. As a result, companies like Fidelity offer incentives to attract customers.

35. One such incentive offered by Fidelity was the promise on its website that "All new issue CDs offered by Fidelity are fee-free." The only disclosure regarding fees at the time Plaintiff made his purchases was a statement that "[U]nder the arrangements established by the Firm with the Issuer, the Firm will receive a **placement fee from the Issuer** in connection with your purchase of a CD." (CD Disclosure Document, "FEES" section) (emphasis added). Fidelity represented to Plaintiff and other consumers it would get a "fee" **from the issuing bank**, but that consumers would not be charged any other fee in connection with their purchase of

---

[1] This is one of the benefits of purchasing brokered CDs. The products allow risk-averse consumers to have more than $250,000.00 FDIC insured because the money is held at the issuing bank, not at the brokerage.

brokered CDs. This was false as Fidelity was in fact charging consumers significant fees.

36. This "fee-free" sentence was inaccurate in describing to purchasers how Fidelity was earning money on the transactions and failed to disclose that Fidelity was earning a profit by reducing the returns which should have gone to the consumers. In short, Fidelity was charging consumers a fee, not the Issuer.

37. At times, Fidelity was in fact charging fees which were more than twice of what consumers were earning on those purchases. When Plaintiff complained, Fidelity did not deny it was engaging in this illicit activity.

38. Fidelity provided a platform for consumers to purchase bank issued CDs directly from Fidelity. The CDs issued by the banks had higher rates of return than the **exact same CDs being sold through Fidelity**. The failure to disclose this fact, accompanied with an **explicit promise** that Fidelity would not charge consumers a fee constitutes unfair, fraudulent and deceitful business practices, unjustly enriched the Defendant and misled and harmed consumers, including Plaintiff.

39. Due to the unlawful and deceitful actions of Defendants, Plaintiff and other California investors have funneled their investment dollars to Fidelity, on the false promise that the purchase of bank-issued CDs would be "fee-free."

**C. <u>Plaintiff's Purchases of CDs Show a Pattern and Practice of Fidelity Charging Fees on Fee Free Products</u>**

40. Plaintiff's transactions during the relevant time period establish a pattern and practice of Fidelity charging fees on purportedly fee-free products by reducing the interest rate offered by the issuing bank. This practice resulted in significant fees being charged to Plaintiff and consumers on transactions which were promised to be fee-free. Mr. Straghalis relied upon the promise that the transactions would be fee free in deciding to purchase the brokered CDs.

41. On May 5, 2006, Plaintiff purchased a $98,000.00 brokered CD through Fidelity.com. The issuing bank was IndyMac Bank of Pasadena, California (now One West Bank). The brokered CD was a six month CD, set to mature on November 10, 2006. Fidelity offered a rate of return of 4.85% on the purchase. IndyMac was offering a rate of at least 5.00% **for the exact same CD** purchased directly through the bank. As a result of Fidelity's unilateral and undisclosed rate reduction, Plaintiff earned less in interest, instead of earning more. Consequently, Fidelity took a fee from Plaintiff.

42. Fidelity promised on its website that the purchase of the brokered CD by Plaintiff would be "fee-free." Plaintiff relied upon that statement, and interpreted it to mean that Fidelity would be providing the same interest rate as the issuing bank, and would not be earning its profit at Straghalis' expense. This promise was knowingly false when it was made as Fidelity was actively charging a fee and profiting at Straghalis' expense.

43. On June 23, 2008, Plaintiff purchased a $95,000.00 brokered CD through Fidelity.com. The issuing bank was GMAC Bank of Midvale, Utah. The brokered CD was a four month CD, set to mature on October 27, 2008. Fidelity offered a rate of return of 3.05% on the purchase. GMAC Bank was offering a rate of at least 3.25% **for the exact same CD** purchased directly through the bank. As a result of Fidelity's unilateral and undisclosed rate reduction, Plaintiff earned approximately less in interest, instead of earning more. Consequently, Fidelity charged a fee to Plaintiff.

44. Fidelity promised on its website that the purchase of the brokered CD by Plaintiff would be "fee-free." Plaintiff relied upon that statement, and interpreted it to mean that Fidelity would be providing the same interest rate as the issuing bank, and would not be earning its profit at Straghalis' expense. This promise was knowingly false when it was made as Fidelity was actively charging a fee and profiting at Straghalis' expense.

45. On September 17, 2008 Plaintiff purchased two $100,000.00 brokered CDs through Fidelity.com issued by Capital One Bank USA N.A. of Glen Allen, Virginia. The brokered CD was a one year CD, set to mature on September 24, 2009. Fidelity offered a rate of return of 3.50% on the purchase. Capital One Bank was offering a rate of at least 4.00% **for the exact same CD** purchased directly through the bank. As a result of Fidelity's unilateral and undisclosed rate reduction, Plaintiff earned approximately less in interest, instead of earning more on each CD. Consequently, Fidelity charged a fee to Plaintiff on each transaction.

46. Fidelity promised on its website that the purchase of the brokered CDs by Plaintiff would be "fee-free." Plaintiff relied upon that statement, and interpreted it to mean that Fidelity would be providing the same interest rate as the issuing bank, and would not be earning its profit at Straghalis' expense. These promises were knowingly false when they were made as Fidelity was actively charging a fee and profiting at Straghalis' expense.

47. Also on September 17, 2008, Plaintiff purchased a $100,000.00 brokered CD through Fidelity.com. The issuing bank was Capital One N.A. of McLean, Virginia. The brokered CD was a one year CD, set to mature on September 24, 2009. Fidelity offered a rate of return of 3.50% on the purchase. Capital One N.A. was offering a rate of at least 4.00% **for the exact same CD** purchased directly through the bank. As a result of Fidelity's unilateral and undisclosed rate reduction, Plaintiff earned less in interest, instead of earning more in interest. Consequently, Fidelity charged a fee to Plaintiff.

48. Fidelity promised on its website that the purchase of the brokered CD by Plaintiff would be "fee-free." Plaintiff relied upon that statement, and interpreted it to mean that Fidelity would be providing the same interest rate as the issuing bank, and would not be earning its profit at Straghalis' expense. This promise was knowingly false when it was made as Fidelity was actively charging a fee and profiting at Straghalis' expense.

49. Also on September 17, 2008, Plaintiff purchased a $100,000.00 brokered CD through Fidelity.com. The issuing bank was CIT Bank of Salt Lake City, Utah. The brokered CD was a one year CD, set to mature on September 24, 2009. Fidelity offered a rate of return of 3.50% on the purchase. CIT Bank was offering a rate of at least 3.60% **for the exact same CD** purchased directly through the bank. As a result of Fidelity's unilateral and undisclosed rate reduction, Plaintiff earned less in interest, instead of earning more in interest. Consequently, Fidelity charged a fee to Plaintiff.

50. Fidelity promised on its website that the purchase of the brokered CD by Plaintiff would be "fee-free." Plaintiff relied upon that statement, and interpreted it to mean that Fidelity would be providing the same interest rate as the issuing bank, and would not be earning its profit at Straghalis' expense. This promise was knowingly false when it was made as Fidelity was actively charging a fee and profiting at Straghalis' expense.

51. All of the brokered CDs purchased by Plaintiff were promised by Fidelity to be "fee-free."

52. When Fidelity confirms the transaction in writing through Transaction Confirmation documents, which it provides to its clients after purchases, it does not disclose that it is charging a fee.

**D. <u>Plaintiff's Discovery of the Fees and Fidelity's Explanation of its Conduct</u>**

53. In or about May 2009, Plaintiff was again considering purchasing brokered CDs. He discovered that one of the brokered CDs Fidelity was offering as an investment was being issued by GMAC (now Ally Bank). The brokered CD was being offered by Fidelity as a one year CD with an interest rate of 1.05%. However, GMAC was offering an interest rate of 2.76% **for the exact same CD** purchased directly through the bank.

54. On May 9, 2009, Plaintiff contacted Fidelity's customer service e-mail address to inform Fidelity that their website contained inaccurate information concerning the purchase of CDs, specifically regarding the posted statement that "all new issue CDs offered by Fidelity are fee-free." Plaintiff also requested an explanation of the discrepancy between Fidelity's rate of return and the rates offered by the issuing banks.

55. On May 11, 2009, Fidelity account manager Christopher Herb replied via email. Mr. Herb wrote that "by no fee, [we] refer to the fact that the yield that is stated/promised in the online quote is the yield you will receive." Mr. Herb did not deny any of the allegations about Fidelity's failure to disclose nor did he refer to any portion of the Fidelity website that contained a disclosure or an explanation of "fee-free" which comported with his explanation.

56. Notably, in that same email, Mr. Herb admitted that the structure of the fees Fidelity was paid was **not disclosed to anyone, let alone consumers**. Mr. Herb wrote:

> Yes, banks pay Fidelity to offer their cds [sic], just as other fund companies pay Fidelity or other insurance companies pay Fidelity to offer their products. **The terms of those arrangements are not disclosed to me or anyone else.** (Emphasis added)

This response by Mr. Herb was reviewed by Fidelity's complaint department, which agreed with his statement that the arrangements regarding Fidelity's fees were not disclosed.

57. When Fidelity was given yet another opportunity to identify where it had accurately disclosed its fees and profits from its online offering of brokered CDs, it again failed to do so, evidencing that no proper and adequate disclosure had been made to consumers.

58. On June 7, 2009, Plaintiff wrote to Diane Rankin, Manager of the Pasadena Fidelity branch. Plaintiff was following up on a phone call between Plaintiff and Ms. Rankin. Plaintiff wrote that:

> I wish to go on record that in response to my specific inquiry regarding the spread between the interest rate paid by GMAC and the rate you offer these CDs to your customers, a Vice President in your organization told you in an email that the spread on these transactions is **20 basis points**. You read his email to me over the phone but you declined to forward the email to me. Again, for the record I want to emphasize that such a spread (assuming your V.P. is right) represents a **19.05% profit margin** and would be considered outrageous. I also told you that in fairness to your customers you should steer them away from such dreadful investments and instead tell them they would be better off purchasing the CD directly from the GMAC where they can earn 2.76% (as opposed to 1.05% from Fidelity) for the identical risk. (Emphasis added)

Plaintiff received no response to this letter.

59. Plaintiff again wrote to Fidelity on August 2, 2009 – this time to Fidelity CEO Ned Johnson III – seeking full disclosure of the interest rates Fidelity and the issuing banks negotiated on the brokered CDs he had previously purchased, as well as the prevailing rate offered to customers by the issuing banks for CDs with the same maturity date. Plaintiff also sought compensation for the difference.

60. Shaun McEnery, assistant to the Fidelity Chairman, responded to Plaintiff on September 15, 2009 (six weeks later) that, "Fidelity makes new issue CDs available to our clients **without a separate transaction fee; however, Fidelity may receive compensation of up to 2% for new issue brokered CDs from an underwriter in the form of a concession**. I apologize if you were previously unaware of this relationship, however, I can assure you that this disclosure is available on Fidelity.com." (Emphasis added) Despite his assurance, Mr. McEnery did not attach or describe where this alleged disclosure was available on Fidelity's website.

61. Finally, on September 25, 2009, four months after Plaintiff's first inquiry on the subject, Mr. McEnery directed Plaintiff to the CD page of the Fidelity website which contained a footnote next to the statement that the CDs were "fee-free." The footnote stated "Fidelity makes new issue CDs available without a separate transaction fee. Fidelity may receive compensation for new issue brokered

CDs from an underwriter in the form of a concession. It is typically of between 1 and 2% of the investment amount." This was the first time Plaintiff was informed of the existence of this statement. This footnote was added in early 2009. It was **not on Fidelity's website during the relevant time period.**

62. As a result of discovering that brokered CDs were not "fee-free," Plaintiff ceased investing in brokered CDs through Fidelity.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (COMMON LAW FRAUD – AGAINST ALL DEFENDANTS)

63. Plaintiff and the members of the Class incorporate and reallege each and every allegation above as if fully set forth in this Cause of Action, and further allege as follows.

64. Defendants, and each of them, represented to Plaintiff and the Class that all new-issue CDs, including brokered CDs, were "fee-free." This statement was made on the front page of the CD portion of Defendants' website.

65. At the time Defendants made the representations Fidelity was actively charging fees on brokered CDs by reducing the interest rate on the CDs from the rates offered issuing banks around the country.

66. Defendants knew they were changing the interest rates on the brokered CDs which resulted in consumers earning less money than they were entitled to. Therefore, Defendants knew the representation was false.

67. Defendants also knew, or were reckless in not knowing, that the disclosures available on the website were inadequate during the relevant time period.

68. Defendants intended to induce consumers to purchase brokered CDs through Fidelity's platform. Defendants prominently displayed the "fee-free" language on the front CD page of Fidelity's website. Defendants did not have a footnote or an asterisk attached to that language during the relevant time period.

Defendants intended that consumers would rely upon the "fee-free" language in deciding whether or not to conduct business through Fidelity.com.

69. Plaintiff and members of the Class did in fact rely upon the representation that the purchase was "fee-free." This reliance was reasonable. Plaintiff believed Fidelity was earning income through **some other means** other than charging fees to consumers because of the "fee-free" statement on the website. Plaintiff interpreted fee-free to mean that Fidelity would be providing the same interest rate as the issuing bank and would not be earning its profit at his expense.

70. Plaintiff and members of the Class were harmed by Fidelity's misrepresentations on the website in that they purchased CDs believing they were fee free when Fidelity was charging fees. Plaintiff specifically was harmed because he was not paid money to which he was entitled. Had the transactions actually been "fee-free," Plaintiff would have received this money as part of the return on his investment.

71. As a result of the conduct of Defendants, Plaintiff and the Class have suffered and will continue to suffer general and specific damages in an amount to be determined according to proof at trial.

72. In doing the actions alleged herein, Defendants, and each of them, acted towards Plaintiff and the Class with malice, oppression, fraud and a conscious disregard of their rights.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SECOND CAUSE OF ACTION

## (VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.* AGAINST ALL DEFENDANTS)

73. Plaintiff and the members of the Class incorporate and reallege each and every allegation above as if fully set forth in this Cause of Action, and further allege as follows.

74. Plaintiff and members of the Class bring this cause of action in both their individual capacities and on behalf of the general public.

75. California Business and Professions Code, sections 17200 *et seq.*, prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice" and "unfair deceptive, untrue or misleading advertising."

76. Defendants conduct constitutes unlawful, unfair or fraudulent business practices including, but not limited to, the following:

a. Defendants' conduct of disguising and hiding fees is contrary to legislatively declared policies of the state of California;

b. Defendants' practice violates Bus. & Prof. Code §§ 17200 *et seq.* in that it purports to be "fee-free" in order to attract consumers away from other brokerage companies who adequately disclose their fees;

c. Defendants' practice violates Bus. & Prof. Code §§ 17200 *et seq.* as it constitutes unjust enrichment in that Defendants are earning and retaining money to which consumers have a right;

d. Defendants' practice has a widespread and harmful impact on consumers, many of whom are investing money which has been saved for retirement in intentionally conservative investment products; and,

e. The method of earning hidden profits at the expense of the consumers constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.*.

f. Falsely advertising to the public that new issue brokered CDs are fee-free while knowingly charging a fee to consumers;

g. Falsely representing to consumers that new issue brokered CDs are fee-free while knowingly charging a fee to consumers; and,

h. Failing to disclose the existence of the fees being charged by Fidelity.

77. Plaintiff and the Class have been harmed by the conduct of Defendants.

78. Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and the Class and/or disgorge their illicit profits.

79. Plaintiffs and the Class are also entitled to injunctive relief to stop these practices. Specifically, Defendants should be enjoined from using the "fee-free" language when they are in fact charging fees to consumers.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class pray for judgment and relief as follows:

1. Declaring this action to be a proper class action on behalf of the Class defined herein;

2. Declaring the acts of the Defendants are illegal and unlawful and in violation of California state common and statutory law;

3. Special, general and compensatory damages, according to proof at trial;

4. Restitutionary damages and disgorgement of illicit profits according to proof at trial;

5. Pre-judgment and post-judgment interest in the maximum amount allowed by law;

6. Costs and reasonable attorneys' fees;

7. Any and all other and further relief as this Court deems just and proper.

Dated: June 6, 2011 **COTCHETT PITRE & MCCARTHY, LLP**

By: */s/ Niall P. McCarthy*
NIALL P. McCARTHY

Dated: June 6, 2011 **MINAMI TAMAKI, LLP**

By: */s/ Derek G. Howard*
DEREK G. HOWARD

**JURY TRIAL DEMAND**

Plaintiff and the Class hereby demand a jury trial for the first cause of action.

Dated: June 6, 2011

**COTCHETT PITRE & MCCARTHY, LLP**

By: */s/ Niall P. McCarthy*
NIALL P. McCARTHY

Dated: June 6, 2011

**MINAMI TAMAKI, LLP**

By: */s/ Derek G. Howard*
DEREK G. HOWARD